The court has three cases on for argument today. The first is number 2009-1323, American Medical v. Biolitec. Mr. Hanson, when you're ready. Good morning and may it please the court. Leland Hanson on behalf of the Appellants, American Medical Systems and Laserscope. Here the district court construed the claim preambles as limitations requiring a wavelength that is absorbed only to a negligible degree by water or other irritants. The district court then applied that claim construction to exclude wavelengths that are expressly disclosed as preferred in the specification of the patent. The way this happened in the prosecution history, as I understand it, and please correct me if I'm wrong about this, that the photo-selective language was added in the course of the prosecution both to the claims and to the specification. In other words, it was a continuation in part and that language got added to the specification at the same time that these claims were added using that language. Am I right about that? Yes, I believe so. The photo-selective language was original to the CIP application. It was not in the parent application. Right, so wouldn't that explain some of the potential inconsistency here in the specification? I don't believe that there's any precedent for disregarding any portion of the specification on that basis and more to the point, this wavelength range that we're referring to that was disclosed as preferred, 200 to 1,000 nanometers, which includes BioLitex wavelength to which they operate, that was included not only in the parent application, but it was also included in new material that was added in the CIP application. And although BioLitex says otherwise in their briefs, they're simply wrong, factually wrong. Doesn't that history suggest that in trying to figure out what photo-selective means that we should look at the parts of the specification that were added and talk specifically about it and not concern ourselves so much with other parts of the specification, which might be directed to other terminology or other claims? No? I'm not aware of any precedent that would support disregarding one part of the specification because it was from an original parent application and getting added emphasis to new matter in a CIP application. That's not quite what I'm suggesting. What I'm suggesting is that the photo-selective language was added in the course of the prosecution and that in order to figure out what that language means in the preamble, assuming that it is a claim limitation, it's appropriate to look at those parts of the specification that were added at the same time and that speak about photo-selectivity. No? Again, I'm not aware of any such precedent, but if we were to follow that course with the matter that came in, the new matter in the CIP application, this wavelength range of 200 to 1,000 nanometers was again expressly reiterated. That was in the original application, but it was again reiterated in the new matter in the CIP application. And it made its way into the ultimate spec in this case? Yes. Which is the portion of the spec that you're referring to now that was added in the CIP? There are two instances in the patent where the range of 200 to 1,000 nanometers is disclosed. One is in the summary of the invention, column four, beginning at about line 28. And that same wavelength range is described again in the detailed description of the invention, column eight, beginning at about line 10. I believe that this second instance in the detailed description came in with the CIP application. It was not in the original application. I may be wrong. I know that in at least one of these two instances were new. You know that one of them is new. You just don't know which is. One of them is new. As I stand here today and my colleague I'm sure can provide the answer, I'm not sure which one of them is new. I believe it was, it came in in the detailed description portion there. My partner Mr. McBride confirms that yes, it is. The description in column eight that refers to 200 to 1,000 nanometers, that particular wavelength range as appropriate for this invention, this was added in the CIP. Yes. Well let me ask you this. If we disagree with you on the question of whether or not the preamble is limiting, what disagreement is there between the definition then of photo selection that the district court took from the summary of the invention and what you would propose as the correct definition? We would propose that photo selective in the context of the patent of the whole means using radiation that is readily or preferentially absorbed in the tissue. Tissue absorption is the focus of this particular patent. So you would ignore the language in column four that also says while being absorbed only a negligible degree by water or other irrigant. Would you have us ignore that language with respect to what it means? I don't think it's necessary to ignore that. In some certain claims are directed to wavelengths that everyone agrees would be readily or only negligibly absorbed in the irrigant. There's also other claims that are specifically directed to close placement of the fiber to the tissue, which avoids irrigant absorption. But I don't think that if you look at photo selective vaporization as a whole in the context of this patent, that you would understand that negligible absorption in the irrigant is an essential or critical part of this invention. And in fact, the district court acknowledged this much. Are the two irreconcilable? That is, if you have a direct contact procedure, there is no way to say there is negligible degree of water by the irritant? The two just don't go together? There's at least two ways describing the patent for controlling irrigant absorption. One is using a wavelength that regardless of the amount of irrigant is not absorbed by the patent, and the other is using very little, if any, irrigant to absorb. Both of these are disclosed. So you're saying that in that second context, you wouldn't describe it as negligible absorption. There's just no absorption. You'd agree that the phrase negligible absorption is inapplicable to the direct contact procedure, right? No, I think that in the real world, having zero absorption is probably impossible. So if you're operating in close placement, or even if there's direct contact, you still would have some negligible absorption in that irrigant. And in this portion of the specification you're referring to, this is the first sentence in the summary of the invention, the district court frankly didn't know what to do with the phrase during the procedure and chose to disregard it because the district court concluded it was inconsistent with the court's analysis, with the court's other analysis. But that during the procedure or during the operation cannot and should not be ignored in understanding this issue of irrigant absorption. What you're saying, if I understand correctly, is that the district court took the measurements at one millimeter, right? And that there is no real basis for doing a one millimeter measurement where the accused infringing device has direct contact. And that when there is direct contact, it satisfies the standard of its being photo selective according to the definition we've been talking about in the specification. Is that a fair summary? Certainly during, if you operate in close contact or actual contact, there will be negligible absorption in irrigant. It'll satisfy the claim limitation that we've hypothesized. Yes, I believe so. Yes. I understand that that's your position. I'm wondering whether that is not somewhat askew from the passage that Judge Prost focused on because that passage isn't talking about what degree of actual absorption occurs as I read it. It's talking about a wavelength of light that results in negligible absorption, which doesn't depend on how far away you are or close you are. That depends on the wavelength. Isn't that right? Using a radiation that is highly absorptive in the tissue while being absorbed only to a negligible degree by water. My reading of that was a wavelength of radiation that has disparate absorptive effect. There's two different words that are there in the section you just read. One is absorptive, which I think is an adjective and would suggest a characteristic, an immutable characteristic of whatever it is you're talking about. But when it talks about the irrigant, it uses a verb, absorbed. I don't think that it would be appropriate to infer from that that it's necessarily talking about selecting a wavelength as an inherent characteristic of this invention that regardless of the amount of irrigant is not absorbed during the procedure. I'm confused. Maybe you can help me. Does the absorption characteristic depend on the distance between the source of the radiation and the water or tissue as to which absorption is being measured? Judge Bryson's questions were, I think, asking you whether there was sort of an absolute standard that you could look at that would say, okay, this is a wavelength that has these characteristics. I understood you to be arguing that the absorptive characteristics depended on the distance from the water or the tissue. So what's the right answer here? So if we're discussing irrigant absorption, one factor would be the wavelength and the Another factor would be the amount of irrigant. That would also affect the amount that is absorbed. So there is what you might describe as an absorption coefficient. So it doesn't depend on distance, but it does depend on the amount of the irrigant? The absorption coefficient does not depend on the amount of the irrigant. But the amount of absorption, the actual absorption, what's actually absorbed, depends on both the absorption coefficient and the amount of the irrigant. Well, to take a simple example, I mean, if you were using this on dry tissue, and it's not this kind of surgery, but if you were using on this dry tissue, you wouldn't care how absorbent or non-absorbent it was in water. But a given wavelength is going to produce a coefficient of absorption for tissue and for water that is fixed given that wavelength, as I understand the science here. Is that correct? There would be, I believe, a fixed absorption coefficient. But the amount of actual absorption is going to depend on... Depends on how far you are, how much water you're going through, what the situation is in the surgical procedure in operation. Sure. There are a number of factors that were playing to it. So there is an absorption coefficient that would be... Even with close contact. Even with close contact, there would be an absorption coefficient. Which doesn't change depending on distance or the amount of the irrigant. It's fixed for wavelength, right? Yes. It would be fixed for the wavelength. I believe that I am well into my rebuttal time. You're into your rebuttal time. Would you like to say that? I will sit down. Very good. Good morning, ma'am. Please, the court. Mark Giratano with McCarter in English, and we represent BioLitech, the appellee. We submit that the summary of the invention, the statement at the outset, is a very clear definitional statement. Just so that we don't forget, is it true that in Column 8, that language about the 200 to 1,000 was in the parent? My understanding, Your Honor, is that is correct. There are two instances that recite these broader ranges. There is that instance, and there is an instance in the summary. But this was added together with the photo selectivity? This particular language, the 200 to 1,000 was in the parent. This particular phrase at Column 8, line 12, which includes the 200 to the 1,000 plus the 1,100 to the 1,800, my understanding that was added as part of the CIP. Now, if we look at that CIP, I mean, we look at the parent application. In the parent application, it was directed to a different invention. Those claims included the 200 to the 1,000 limitation in the claims. When they filed the CIP, they eliminated those claims that called for 200 to 1,000. Some of this language remained, and some of it was repeated in this part of the application describing a laser system. Now, if we look at these passages, we submit that they are not tied in any way to the photo selective vaporization aspect of the invention. And we submit that the statement, for example, at the outset of the summary is very clear and definitional. And these vague references to other ranges can't be used to contradict that language, which more clearly and narrowly defines the invention. Why not? I mean, there's nothing unclear about the wavelength of the laser light is preferably between 200 and 1,000. Seems to me not much unclear about the language we've been looking at in Column 8. Well, if we look at them in the patent as a whole, Your Honor, and we look at the summary of the invention, the statement that we're pointing to at the outset is a clear definitional statement that we submit applies to the invention as a whole. It doesn't apply to any one particular embodiment. Right. And then if we look at the 200 to 1,000 that's recited in the summary, which is down lower, that's in a paragraph which starts out with a statement according to one embodiment of the invention. Okay? So the 200 to the 1,000 reference is clearly only made with respect to one embodiment. And we submit that it is a vague, broad range, which isn't tied in any way to photo-selective vaporization. What do you see as the limits of wavelength for purposes of the definition as you understand it for something to be photo-selective vaporization? 532 is the core wavelength. How much leeway is there before you think there's no longer negligible absorption by water? Well, Your Honor, the patent does tie a particular range to photo-selectivity. Okay. It does tie the range of 200 to 650 to photo-selectivity. That appears in several instances in the spec, and it also appears in certain claims. So is your answer that that would be your idea of what the definition of photo-selectivity is, incorporating the negligible absorption factor? Well, we submit that the definition of photo-selectivity is as stated, for example, at the outset of the summary, which it's using a wavelength that's highly absorptive in the tissue while being absorbed only to a negligible degree. Okay. But I'm trying to take you one step farther and ask if something is at, let's say, what 650. Yes. And right at 650, would that fall within the definition of photo-selective as you interpret it? 650 would fall within the definition of photo-selective because I believe that the specification makes clear that the range of 200 to 650 is within the scope of that statement at the outset of the summary. Okay. Now, but 651, in your view, would not fall within the scope. Well, I can't answer that question, Your Honor, in all candor. I don't know what the absorption is at 651. I don't know what the exact outer limits of this claim are. I've compared what we have done here. But we have ranges in the specification that give us a pretty good idea. But I can't tell you exactly every wavelength that is negligible and every wavelength that is not. Well, let me put it this way. You are not claiming that the photo-selectivity term defines a precise range between 200 and 650. I am not. I am not. What I am suggesting or what I am stating is that the specification does tie that range to photo-selectivity. It indicates that that range is a photo-selective range. But there could be other. Something outside of that range may still also be photo-selective. It may still be also photo-selective. It may be. It depends on the facts of that particular case. We have only put forth evidence relating to the particular wavelengths at issue here. And we submit that the wavelengths at issue here clearly do not. But they are within the range that is identified in the spec, right? I mean, there is a range in the spec that is 1,000. There is another one that is 1,800. There is a range in the spec that would include 980. But we submit that that range is not tied to photo-selectivity. And that broad reference to a range cannot contradict the clear statements in the specification which define what photo-selectivity is. And the only. I am sorry. And I was just going to suggest the only reasonable way to construe that is that there are, that range includes photo-selective wavelengths but is not a definition of what is photo-selective. That definition is provided at the end of the summary. How is that paragraph that contains the 200 to 1,000 range rewritten in the CIP? Are you referring, Your Honor, to the summary of the invention paragraph? No. I am referring to column 8, which I thought Judge Prost was referring to also, which includes this broader range. And it is a little puzzling that when the CIP was done, which added the photo-selectivity limitation, if it is a limitation, and the language in the spec that would rewrite this paragraph to include that language. So what I am asking is how did this paragraph appear in the original and how was it rewritten in the CIP? Well, Your Honor, my understanding, and we provided a red line. It is actually a black line in the appendix. We ran a comparison of the steps. Where do we find that? This is in the appendix at 8. I am trying to find the exact paragraph that you are referring to. At 8, I am sorry, appendix page 882. And it is at the top. And we can see there. I don't have 882. Appendix A-881 and A-882. And the original paragraph starts at the bottom of 881 and it carries over to the top of 882. It is sort of puzzling that that would be added in the CIP, isn't it? I agree with you. I agree. It is difficult. This is perhaps not the tightest written document and perhaps there are aspects of it that are difficult to explain. But I think what we need to do in construing the claim is we need to look at the statements that are clear. And we submit that when we look at the outset of the summary and we compare it, for example, against the background, which is juxtaposed against, the background tells us that certain wavelengths that do not meet this particular criteria, being highly absorptive in the tissue while being absorbed only to a negligible degree by water, are inferior and seemingly are outside the scope of the invention. And so, for example, the background at column 2 talks about 2100 nanometer radiation. And it tells us that 2100 nanometer, because of its absorption in water, it is not selectively absorbed and is inferior. And then it tells us about 1064 radiation.  That too is inferior. And then it goes on to tell us about 532, which is photo-selective. It's highly absorptive in the tissue. It's negligibly absorbed in the water. And what does it say about 532? It tells us that 532 overcomes the very specific problems identified with 2100 and 1064. And that's juxtaposed against the outset of the summary, which has a definitional statement which tells us that photo-selective means it's based upon using this type of a wavelength. So these, we submit, are very clear definitional statements. And these vague references, one of them is in the context of one embodiment, and this other vague reference that we've pointed to of 200 to 1000, they don't contradict those other statements. Yes, Your Honor. One reference that isn't vague as I read it is the reference in the dependent claims, which reference 200 nanometers to 650 nanometers, suggesting that claim one is broader than that. Wouldn't you draw that inference from those different claims? I submit that the doctrine of claim differentiation would tell us that perhaps claim one is broader than that. And perhaps on the face there are wavelengths outside of the 200 to 650 range that meet the limitations of claim one. There may be. There may be. But it tells us that 980 is not one of those. Well, there are several undisputed facts that we submit dictate that no reasonable juror could conclude that 980 is more than negligibly absorbed by water. But you're saying that's what the standard is, and that that's the standard of claim one? Yes. And that that may include wavelengths which go beyond the 200 to 650? It very well may, Your Honor. It very well may. And so these undisputed facts we submit demonstrate that 980 is more than negligibly absorbed. One of them is the fact that with 980, it's undisputed that you need to take the fiber and put it directly in contact with the tissue so that you avoid the absorption in the irrigant. If you need to do that to avoid the absorption, then it's necessarily more than negligible. And we also submit that there is absolutely no teaching in this patent, no description in this patent, of putting the fiber into contact with the tissue to avoid absorption by what otherwise would be a non-photoselective wavelength. The coefficient of absorption at 980 is 0.43. Is that the right number? I believe it is, Your Honor. Okay. And do you happen to know what the coefficient of absorption at 650 is? I do not know that off the top of my head. My partner, Eric Rondle, may have that information. I think you have an answer on the way. At 650, the absorption coefficient, and I'm looking right now at the appendix at page 2274. At 650, the absorption coefficient is 0.0032. So it's several orders of magnitude different. And so what I was pointing to was the fact that we submit that there is no teaching in this specification of using close placement to avoid absorption by an irrigant that would otherwise be non-photoselective. Well, there is teaching of close placement, right? Well, there is. Yes, you're correct, Your Honor. There's one passage that did that, I think. Right. I'm familiar with the passage at column 5. Okay. And we submit that that passage is clear, that the teaching for close placement is to control the spot size and therefore control the irradiance. A claim or two, I think, also. And that is repeated in the claim. And we submit that the only teaching there is merely to control spot size and irradiance. There is no indication that you can actually put it in contact so that you avoid absorption by an otherwise non-photoselective wavelength. We submit that the entire patent contemplates using a photoselective wavelength. What about in column 8, the sapphire lasers? I thought that, too, was related to sort of a focused close placement procedure. Well, look at that. You know, what I'm referring to, it's line 8 through... It's the beginning of the sentence we've talked about repeatedly here. Yeah, that sentence, Your Honor, it appears in the context of the embodiment of FIG-1. And the embodiment of FIG-1 is a laser system that's used to generate 532 nanometer radiation. And the way they do that is they take 1064 nanometer radiation and they frequency double it. And that means they cut it in half. And by frequency doubling 1064, they can output 532. Now, that's the embodiment of FIG-1. It's teaching us how to generate 532 nanometer radiation. They happen to have this sentence at the end that broadly says you can use other types of lasers that may have other ranges of wavelengths. That's about all we can get out of that. It's not tied to photo selectivity. And it doesn't tell us, I submit... Well, I mean, it is... They're talking about the embodiment, are you saying? I mean, this embodiment is included in photo selectivity, right? Yes, but I... Well, the embodiment of FIG-1, which generates 532, is clearly a photo... a laser that generates a photo selective wavelength. This reference to these other alternatives, the patent does not tell us that those broad ranges define photo selectivity. Those define the ranges of wavelengths that may be used in a system of the invention. It may be that what they're talking about there is those broad wavelengths could be used in a frequency doubled system where that wavelength is cut in half. So, for example, when they have 1064, they tell us in FIG-1 they're using 1064, and when they frequency double it, it gives us 532. But the 1800 wouldn't help you much because you'd be right close to the 900. It's 900. Now, it's not... And in all candor, I'm not sure what the absorption is at 900, but I... It can't be that different from... Well, it... Oh, that sounds like the curve. The curve is not straight. It's pretty steep. The curve is not straight, yeah. And it has peaks and valleys, and it's... Oh, does it? It's not a smooth curve? It's not a smooth curve. It's not a straight line. It's not a straight line. Okay. The absorption coefficient that you showed us for water on 2274, is there a similar table for the absorption coefficient for tissue? I believe not, Your Honor, because tissue is made up of both water and oxyhemoglobin, among other things, and I don't believe there is, in evidence in this case... And tissue is a dynamic living thing where its components can vary. You know, one man's prostate may have less blood than another man's prostate, and therefore the absorption in that tissue will differ, depending upon the particular prostate and its condition. Well, maybe I'm missing something. And then I don't quite understand how you apply the standard if there's no tissue standard to use. I mean, what you're supposed to do is to... So it's highly absorptive in tissue by being absorbed only to a negligible degree by water. You've shown us the table for water. We can figure out whether we consider the particular figures at different wavelengths being negligible or not, but how do we figure out what highly absorptive in tissue means if there's no standard for tissue? Well, I think if you're the patentee and the wavelength is being absorbed in the tissue and is ablating the prostate and is ablating thin layers of tissue, then you can assert that it's highly absorptive in the tissue. You don't look to a table for that. My assumption is that is a factual question depending upon what happens when you put that wavelength into the tissue. What we can do... Negligible is... I mean, I think I had the same question as Judge Stark. Negligible is a relative term. I mean, 0.43 may be negligible if the coefficient of tissue... I don't know if these things can go over 1, but if they can, you could have a much higher coefficient of absorption for a particular tissue, and then 0.43 begins to look negligible. Well, what's in evidence is the absorption... Well, there's several facts here that we think... Negligible is... It is in part a relative term, and that is one way to determine whether or not the absorption is negligible by comparing your wavelength to something that characterizes negligible on the patent, which is one of the facts that the court looked to. But there are... And right now, the only evidence in front of the court that was put forth by AMS was the absorption characteristics of 0.532, and they also put in the absorption characteristics of 0.2100. And we submit that the court properly compared 0.980 to 0.532 because that's what the claim calls for. But there are other facts that you can look at to determine whether or not the absorption is negligible or not. Negligible means that it's something that doesn't need to be taken into account. And when the undisputed facts show that with 0.980, you need to put that fiber into direct contact with the tissue to avoid that absorption, then it necessarily is something that needs to be taken into account. What is... If I understood what you said a couple of minutes ago, you were suggesting that the fact that it burns the tissue, destroys the tissue, suggests something about the coefficient. Right? The extent to which it burns the tissue is an indication of its absorption in the tissue and whether or not it's highly absorptive in the tissue. And what is the evidence about that? I mean, did some expert testify about that? Or is there some industry publication? I mean, you say that there's a connection, but what is there in the record that establishes the connection? Well, what is in the record is we do have a table for oxyhemoglobin. The tissue is made up of water and oxyhemoglobin. And so one can look at the absorption characteristics in oxyhemoglobin, which is what they did in the patent. And the patent says that if it's highly absorbed in oxyhemoglobin, like 532, and negligibly absorbed in water, like 532, then it is photoselective, meaning it's selectively absorbed in the prostate tissue because of the hemoglobin in the prostate tissue. And we submit the plain language of the claim, requires because it's photoselective and it's selectively absorbed in the tissue, then it must not be absorbed and must not cause vaporization of something else. But did anybody testify to this? I mean, this is an interesting lawyer argument, but what is there in the record that tells us how to make these connections? Well, in the record we have the tables for the absorption coefficients in water and we have the tables for the absorption coefficients in oxyhemoglobin. But is there somebody who testified to what you were essentially saying? Yes. That tissue is a mixture of water and hemoglobin, therefore you can look at the hemoglobin table and draw some conclusions from that. Yes. There are expert declarations in the record. There's an expert declaration of AMS's own expert who testified that prostate tissue is made up of water and oxyhemoglobin. Did he talk about the proportions that typically exist or likely exist? Yes. Yes, and he indicated that in prostate tissue the absorption of 980 in water is about equal to the amount of energy that's absorbed in oxyhemoglobin. And he also, AMS asserts that 980 is highly absorptive in prostate tissue and therefore if it's highly absorptive in prostate tissue and about half of that absorption is in water, then how can it be negligible? It can't be. Can I ask you just one other random question, which is that your position and the district court's position was that this is a limitation. And looking at Claim 1, after comprising one of the things that Claim 1 says is the radiation being absorbed substantially completely by the tissue, which seems to me a kind of different standard than the one in the summary language that we've been talking about all morning, which is isn't there a difference between highly absorptive in the tissue and being absorbed substantially completely by the tissue? Let's see. I'm comparing the definition in Column 4 to the claim in 17. My understanding is the laser radiation being absorbed substantially completely by the tissue within about one millimeter of the surface is a slightly different way of talking about using a radiation that's highly absorptive in the tissue and is also reflecting the concept in the summary of... Which would make this redundant, then? Well, we oppose the limitation of the preamble, no? I submit, Your Honor, that it's not completely redundant. And I submit that in order for this preamble not to be a limitation of the claim, that it has to be merely duplicative of what's in the body of the claim. We agree that aspects of photoselective vaporization, as defined at the outset of the summary, do appear in the body of the claim. But there are important and fundamental characteristics that don't. Well, I'm a little confused by your answer. Well, I didn't mean to cut you off. You were about to say aspects that don't. Did you have a full colon and then some aspects? Well, the aspect that does not appear in the body of the claim is the step of using a wavelength that is absorbed only to a negligible degree by water. What you're saying, if I understand it, is that the preamble in talking about photoselectivity is referring to the absorption coefficient, whereas the body of the claim to which Judge Prost referred is talking about whether there's actual absorption depending on the distance from the tissue. Is that correct? No? The actual absorption, in the context of this patent, the distance from the tissue really speaks to the irradiance, which is reflected in Claim 1. So Claim 1 states at the end that it's greater than about 10 kilowatts per centimeter squared in a spot size of at least about 0.5 millimeters squared. The way you control that spot size in accordance with the patent is by controlling the distance from the tissue. That's how you, the smaller the spot size, the closer you are, the smaller the spot size, the higher the irradiance. The absorption, on the other hand, that's a characteristic of whatever wavelength you're using. Now, in response to Judge Prost, you characterized it, I think I understand your characterization of the reference to the laser radiation being absorbed substantially completely by the tissue means that it has to be absorbed by the tissue and not by something else, i.e., the irrigant. Is that essentially what you mean? Yes. But I thought there was another way of reading that passage. It says being absorbed substantially completely by the tissue within about one millimeter of the surface, which is the clause, comma. And I thought it was saying that it can't be absorbed beyond one millimeter. And it's going to be, whatever is absorbed is absorbed within one millimeter of the surface. Isn't that another, perhaps, more plausible reading given the language? The court construed the language substantially completely absorbed within one millimeter to the district court to mean that about 63% of the energy is absorbed within one millimeter. Right. So I believe that's consistent with what you just said. The question really is, is that clause talking about substantial absorption in tissue, full stop, as opposed to in irrigant, or is it saying substantially absorbed, that which is absorbed by the tissue is substantially absorbed within one millimeter? Your Honor, I'm sorry, could you point me to exactly where you are? I apologize. Sure. It's in the claim. It's the clause that is in the second line of the delivering. I was on the wrong page. I apologize. I was on the claim one. The laser radiation being absorbed substantially completely by the tissue within about one millimeter of the surface. Yes. Now, is that saying that which is absorbed by the tissue is absorbed within a millimeter, or is it saying that the tissue absorbs almost all the radiation? The latter. You were arguing in response to Judge Prost, you said the latter, and I'm proposing that maybe the former is a better reading of the language. In other words, if I understand Judge Bryson correctly, he's saying this is designed to make sure that it doesn't burn too deeply into the tissue. I agree. Okay. I agree.  I apologize. Thank you very much. We held you up, so we'll give Mr. Hansen some extra time on his rebuttal. Why don't we give you your full five minutes, and if you need a little more than that. Thank you. I will endeavor to be concise. First, I want to make the point that contrary to Mr. Giarratana's statements, there is nothing in this patent that singles out 200 to 650 as photo selective, as opposed to the broader range of 200 to 1,000 and 1,100 to 1,800. I don't think he's suggesting that that's the definition of photo selectivity. I think he's suggesting that that's within the range of photo selectivity, but that it can be broader than that depending on applying the standard that's set forth in the spec. But I think in order to try to distinguish the broader range of 200 to 1,000, he was trying to make the point that 200 to 650 is somewhere in the patent specifically tied to photo selectivity as opposed to the broader range, and that's not the case. There's nothing in the patent that singles out 200 to 650 as photo selective and not the broader range. Do you agree with the statement about close placement not being something that's covered by this patent or the focusing of the SAFIRE laser? I would agree that in the discussion in column 7, the discussion in column 8 that we've been referring to, that is not specifically referring to close placement. Then you're looking at column 5, which is the other reference. Which does specifically disclose close placement, and contrary to the attorney argument you've just heard, there's no discussion of spot size in column 5 where it discusses increasing irradiance, and there is an affidavit in the record from a Mr. Arnold, a person skilled in the art, who says that a person of ordinary skill would understand the relationship between increasing irradiance and limiting the amount of irrigate. The amount of, and it's really a natural observation, the amount of irradiance that reaches the surface of the tissue or the amount of power that reaches the tissue will be affected by the amount of absorption in the irrigate. So one way to increase irradiance is to limit the absorption in the irrigate by having close placement. I think it's paragraphs 8 and 19, at least, in Mr. Arnold's declaration that opine to this. So there's actual evidence in the record of how a person skilled in the art would understand this discussion as opposed to the attorney argument which says it's only about spot size. Now, the idea that 200 to 1,000 nanometers is inconsistent with the other aspects of the patent or the claims is only if you assume that 980 nanometers is not negligibly absorbed in water.  The absorption coefficients can be much higher than 1 to answer the question that you had, Judge Bryson. And what about the evidence that the absorption at 980 is roughly the same between water and tissue, or the particular tissue that we're dealing with here, oxygen and globin? That is not correct. Okay. And there's ample evidence in the record that that is not correct. Mr. Giarratana pointed out that at one point in the patent, there's a discussion of the absorptivity in oxyhemoglobin compared to the absorptivity in water. And in that discussion, it describes as one baseline of comparison for comparing high absorption to low absorption a factor of 10. This was expressly endorsed by BioLitech during the claim construction. So a difference of 10 is significant. And the evidence in the record is that the absorptivity at 980 nanometers is 14 times higher in blood than it is in water. And there's ample evidence of that in the record. Furthermore, in effect, to get at this relative term, negligible absorption, in effect, what the district court did is compared one preferred wavelength to another preferred wavelength, compared 980 nanometers, which is described as a preferred wavelength, to 532 nanometers, which is another preferred wavelength. But that may have been the wrong thing to do. But I think what Judge Bryson is suggesting is that if you compare it to the absorption characteristics as between tissue and water, and if they're equal, then it's hard to say that the highly absorptive negligible standard would be satisfied. And they're not equal. And there's ample evidence in the record, I believe, that they're not. Well, where do we find that they're not equal? Well, there's evidence. The judge said that in his opinion. I realize that he said that. We disagree strongly with that. There are, for example, at 2341, a table of absorption coefficients in oxyhemoglobin and water. I believe this is also addressed in Mr. Arnold's declaration. And if we are to compare 980 to another wavelength discussed in the specification, it would be natural to compare it to 2100. 2100 is the only wavelength. No, but help me. I'm still stuck on this equal absorption coefficient between the tissue and the water. Where do we find that it's not equal? In the record at 2341, there is a table of absorption coefficients for oxyhemoglobin. And that shows the 14.05 factors. That's what you're relying on at 980 in that table. And I also believe that… Wait, wait. He's not… But that's hemoglobin. It's not tissue. Is there evidence in the record showing equal absorption coefficients for water and tissue? No. I believe that in the Arnold Declaration, which is in the record at 2674 to 81, there is discussion of absorption in tissue. And we submit that they're not equal and that there is a significant difference. Does he say they're equal? No, he does not say they're equal. Well, where does the judge get the idea that they're equal from? I don't know, Your Honor. I think BioLitech said that, and he just accepted it, but it's not true. What is… I'm a little confused about the relationship between the tissue and the oxyhemoglobin. I had thought that somewhere in the record, and I can't remember where, there was a reference to the fact that there is so much blood in this particular type of tissue that the tissue itself and the oxyhemoglobin are going to be absorbing at effectively the same rate. Am I misremembering what I read? I'm not sure what you read, but I don't believe that that is correct. I believe that there are what they might call various chromophores in prostate tissue. One is blood or oxyhemoglobin. Another would be water, which is an important element. Okay, set the water aside, but in terms of non-water components, oxyhemoglobin… The primary chromophore, I think, would be oxyhemoglobin, but there are other absorbers. There's collagen. You may be stepping beyond my technical expertise here, but there are other absorbers. But it can and sometimes is modeled, and I believe… I don't have the Arnold Declaration in front of me, but I believe that some of these relationships are discussed at least to some extent in the Arnold Declaration. I'll look at that. But at 2100, the only wavelength that is described as having high irrigant absorption in the patent, if you were to compare 980 to 2100, at a distance of 1 millimeter, which is a significant difference in this context, only 4% of the radiation at 980 nanometers would be absorbed, and well over 90% of the radiation at the same distance would be absorbed at 2100. I think a reasonable jury could conclude that if 2100 is the example of high irrigant absorption… When you said absorbed, you meant absorbed by the irrigant. Absorbed by the irrigant, yes, that's what I meant. So with 1 millimeter of irrigant, if you have 1 millimeter of irrigant, more than 90% will be absorbed at 2100 nanometers. About 4% would be absorbed at 980 nanometers. And the relative relationship will be the same regardless of the amount of irrigant. The 4% and 90% may change, but the ratio of the two should stay the same. So you don't boil the water quite as fast, which is the problem with tearing tissue. You don't want to boil the irrigant. Yes, the problem with 2100 is that you're boiling the irrigant and tearing the tissue. And tearing the tissue because of boiling the water within the tissue at a way that results not in a clean vaporization, but in tearing and ripping of the tissue. Mr. Giarratana, with respect to column 8, suggested that the wavelengths discussed there, 200 to 1000 and 1100 to 1800, that that might be before frequency doubling, like 1064 compared to 532. That's clearly not the case. It explicitly says that it's referring to output power and wavelengths. Output power and wavelengths. Not pre-frequency doubling, but if there is any frequency doubling, it's post-frequency doubling. Furthermore, if you accepted that argument and assumed that these wavelengths were pre-frequency doubling, you would knock 532 out. If you take those two ranges, divide them in half, you've now eliminated 532 as one of your preferred. So this clearly is not referring to a pre-frequency doubling wavelength, but rather an output wavelength there in column 8. In column 2, where three wavelengths are discussed, 2100 nanometers, 1064, and 532, it is clear from this discussion that 532 nanometers is not the heart of this invention. It's not the fundamental characteristic of this invention. It's in the prior art. It's being discussed and distinguished as in the prior art. 532 nanometers is also, as the prior art, is also discussed and distinguished in columns, towards the bottom of column 16 and column 17 in the detailed description. This patent is not about 532 nanometers. It's not about absorption in the irrigant. The claims and the discussion as a whole in the patent are directed to absorption in the tissue and what happens when the light, having passed through the irrigant, if any, how it reacts to the tissue and what happens in the tissue. Did you have anything further? I'm done, Your Honor. If you have any questions, I'll be happy to take them. Thank you very much. And we thank both counsel. We appreciate the argument. Thank you. The case is submitted.